UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

**Hon. Hugh B. Scott**

v.

06CR54A

**Report
&
Recommendations**

KELLY A. BOSSINGER,

Defendant.

Before the Court is defendant's motion to suppress her statements and for discovery
(Docket No. 4) and the Government's cross-motion for disclosure from the defendant (Docket
Nos. 5, 6).  The Court issued a Report & Recommendation (Docket No. 11) recommending an
evidentiary hearing on defendant's motion to suppress.  That hearing was conducted on
October 4 and 24, 2006 (Docket Nos. 13, 14, 15, text minute entry of Oct. 4, 2006).

## BACKGROUND

Defendant was an employee of the United States Department of Homeland Security,
Immigration and Customs Enforcement, as a Customs and Border Protection Officer.  She was
indicted on February 7, 2006, for fraud activity connected with computers (unlawfully accessing
a government computer), giving a false statement to the Government, and conspiracy to defraud
the United States, in violation of 18 U.S.C. §§ 1030(a), 1001, and 371.  She entered a not guilty
plea on February 23, 2006, and a Scheduling Order was entered for motions to be argued on
June 29, 2006 (Docket No. 2).  The case was referred to the undersigned for pretrial matters on
June 7, 2006 (Docket No. 7).

On May 12, 2006, defendant moved to suppress her statements and for certain discovery (Docket No. 4).  The Government responds with representations about its production (Docket No. 5).  Defense counsel filed a Reply Affirmation on June 28, 2006 (Docket No. 8).  The motion was argued on July 5, 2006, and the Court reserved decision on unresolved issues (Docket No. 10), rendering a Report (Docket No. 11) that recommended disposition of the discovery sought and scheduled a suppression hearing for October 4, 2006.

*Suppression Hearing*

The Government produced for the suppression hearing the two investigators who questioned defendant on May 10 and June 4, 2004, senior special agents Donald Mania (Docket No. 13) and Steven MacMartin (or "McMartin" as reported in transcript of suppression hearing) (Docket No. 15), both of the Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility.  Defendant did not call any witnesses and did not testify herself.  The Government introduced the first Beckwith warning form executed by defendant (Gov't Ex. 1) and the transcript of the May 10, 2004, questioning (Gov't Ex. 2)[1].  The Government marked for identification the second Beckwith form provided to defendant for her questioning on June 4, 2004 (Gov't Ex. 3).  Defendant marked for identification the investigative report of agent Mania (Def. Ex. A) and the transcript of the June 4, 2004, questioning of defendant (Def. Ex. B).

Both agents testified that their investigation was purely criminal in nature and not administrative (Docket No. 15, Tr. at 130, 131).  They were investigating entry of data

---

[1]The Government, however, did not leave this transcript with the Court following the hearing.

2

surrounding defendant's sister-in-law's vehicle registration on the Homeland Security

Department's Treasury Enforcement Customs Services (or "TECS") computer system (see

Docket No. 13, Tr. at 24).  The agents arrived unannounced on May 10, 2004, for the first

interview (Docket No. 13, Tr. at 26) at defendant's place of work, the Rainbow Bridge Port of

Entry complex in Niagara Falls (id. at 5).  Defendant was interviewed in a second floor

conference room adjacent to her work area (id.) and was questioned by the two agents behind

closed (but not locked) doors (id. at 72-73, 10).  Defendant was advised that she was not

compelled to talk with the agents and that she was free to leave at any time and that the

investigation was criminal in nature and not administrative (id. at 5).  She was not placed under

arrest or threatened with arrest (id. at 9, 7).  Defendant did not have a union representative

present during the interviews because it was a criminal investigation (id. at 51-52).  The

Government contends that defendant never asked to have anyone else present during the

interviews (Docket No. 18, Gov't Reply Memo. at 5; Docket No. 13, Tr. at 10-11; Docket

No. 15, Tr. at 103).

        Defendant points out the coercive elements of her interrogations by agent Mania (Docket

No. 16, Def. Memo. at 3), the lead investigator during these interviews (see Docket No. 15, Tr. at

98, 109 (MacMartin)).  Agent Mania engaged in admittedly aggressive questioning of defendant,

yelling at her, using profanity in disbelief of her answers or denials, accusing defendant of lying

and threatening her with federal charges if she did not tell the truth (Docket No. 16, Def. Memo.

at 3-4; e.g., Docket No. 13, Tr. at 28, 29, 48-49, 66, 67).  Mania also threatened defendant with

administrative sanctions (Docket No. 13, Tr. at 65-66; see id. at 29-30).  Upon defendant's

further denial of any wrongdoing, MacMartin said that "we're not going to leave here until you

3

agree and come to one decision or another" (id. at 51 (quoting May 2004 questioning Tr. at 41)).

The agents' intention was to find the truth and get a confession from defendant (id. at 52).

Defendant became so distressed during the questioning that she cried on a number of occasions

(id. at 38; Docket No. 16, Def. Memo. at 4), and remained so distressed that the agents

questioned whether she should still retain her firearm during the questioning, concerned that she

might use the weapon on herself (Docket No. 13, Tr. at 55, 58; Docket No. 16, Def. Memo. at 5),

although the agents did not take defendant's gun (Docket No. 13, Tr. at 58).  Agent MacMartin,

however, testified that he did not recall the defendant crying during the first interview (Docket

No. 15, Tr. at 110-11), but he testified that defendant became upset and close to tears during the

second interview (id. at 106-07).  The May interview lasted two hours and twenty-two minutes

(Docket No. 18, Gov't Reply Memo. at 6 (citing Gov't Ex. 2, Tr. June 4, 2006, interview at 1,

106), and defendant sought a five minute break near the end of that interview after which she was

re-advised of her right to leave the interview, to not talk further with the agents and to have a

lawyer present (id., citing June 4, 2006, Tr. at 101).

     During both interviews, the agents felt that defendant was not telling the truth (e.g.,

Docket No. 15, Tr. at 102, 104, 106; cf. id. at 107 (defendant at the end began to tell the truth)).

In both interviews, agent Mania engaged in aggressive questioning that involved threats of job

action and/or criminal sanctions, fabrication of evidence, yelling, name-calling, and profanity (id.

at 72).  Mania became more aggressive during the second June interview (Docket No. 15, Tr. at

106, 115 (MacMartin)).  Defendant claims that MacMartin exerted pressure upon her by stating

that she faced administrative and criminal sanctions (id., Tr. at 130).

Neither party introduced into evidence the June 2006 transcript.  The record does not state how long the June interview was.

*Post-Hearing Briefing Schedule*

The Court gave defendant until December 11, 2006, to file post-hearing briefs and the Government initially until January 4, 2007, to reply (Docket No. 15, Tr. at 160-61).  Defendant filed a timely memorandum (Docket No. 16) and the Government (following a granted extension of time, Docket No. 17), filed its reply on January 9, 2007 (Docket No. 18).  The motion was deemed submitted as of January 9, 2007.

## DISCUSSION

I.    Defense Motion to Suppress

Defendant argues that her interviews by the Government were coercive interrogations where she was not given <u>Miranda</u> warnings, contending that her questioning was "accusatorial, prolonged, repeated, and involved aggressive and abusive language, and was overbearing and intimidating in tone and technique" (Docket No. 8, Def. Atty. Reply Affirm. ¶ 8).  Following the suppression hearing, defendant now argues that her statements to Mania and MacMartin were not voluntary and were obtained during custodial interrogation without the required <u>Miranda</u> warnings.  Rather, she was given insufficient <u>Beckwith</u> warnings (Docket No. 16, Def. Memo. at 7-14).

The Government replies that she was not under arrest, was not restrained from leaving or resisting answering the agents' questions, but she voluntarily answered their questions.  The circumstances surrounding her questioning were not custodial and she was not under restraint that approached an arrest in order to make these circumstances custodial interrogation under

5

Miranda and its progeny.  (Docket No. 18, Gov't Reply Memo. at 9, 11-12.)  Alternatively, the

Government repeats its contention that defendant was given the equivalent of Miranda warnings

in receiving Beckwith warning prior to her questioning (Docket No. 5, Gov't Response 9-10,

Ex. 3; Docket No. 18, Gov't Reply Memo. at 9).  See Beckwith v. United States, 425 U.S. 341,

348-49 (1976) (Marshall, J., concurring in judgment) (quoting warnings given in that case).

The issue here is the degree of coercion defendant faced when questioned by Customs

Service investigators, whether she was subject to custodial interrogation that warrants the full

Miranda warnings or a modified warning given here as "Beckwith" warnings, see

Beckwith, supra, 425 U.S. at 345-46.

II.     Was This Custodial Interrogation?

Defendant argues that she endured custodial interrogation during the May and June 2004

interviews.  She claims she was in a custodial setting under coercive pressure, see Miranda v.

Arizona, 384 U.S. 467 (1966); Tankleff v. Senkowski, 135 F.3d 235 (2d Cir. 1998).  She argues

that she was not free to leave, see Campaneria v. Reid, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989).

The questioning was conducted by agents who were aware of the potentially incriminating nature

of the disclosure, see Garner v. United States, 424 U.S. 648 (1976), in fact one agent testified

that his intention was to obtain her confession and the truth from defendant (Docket No. 13, Tr.

at 52).  Thus, defendant concludes that these circumstances warranted advising her of her

Miranda rights.  (Docket No. 16, Def. Memo. at 7-8.)

Agent Mania testified that his partner agent MacMartin told defendant that they were not

going to leave here until defendant agreed and came to a decision (Docket No. 13, Tr. at 51

(answering quote from May 2006 examination)).  The agents asserted psychological pressure

upon defendant, starting with their unannounced arrival at her place of work, placing her in a closed conference room with just them and no one else, their threats of administrative and criminal action against her, fabricating evidence to obtain her confession, yelling at defendant, using profanity, and calling defendant a liar and escalating aggressiveness as defendant did not respond as desired.  These tactics eventually reduced defendant to tears on occasions during the first interview and had her so distraught that the agents considered taking her sidearm.  These tactics were repeated in the second interview where one agent testified that defendant was again reduced to tears.

The Government contends that the defendant was not in custody during this questioned by these agents.  The test of custody is whether she was under restraints comparable to those associated with arrest or not, see United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995), and the Government denies placing defendant in such restraints (Docket No. 18, Gov't Reply Memo. at 8).  The Government argues that, to be custodial interrogation requiring Miranda warnings, two elements needed to be established.  First, the defendant must not be "free to leave," see United States v. Newton, 369 F.3d 659 (2d Cir.), cert. denied, 543 U.S.  947 (2004); United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995), that is, whether a reasonable person would have understood herself to be subject to restraints comparable to those associated with arrest, with the presence or absence of affirmative indications that the defendant was not free to leave, Kirsh, supra, 54 F.3d at 1067 (Docket No. 18, Gov't Reply Memo. at 11-12).  Second, defendant needed to be either under arrest or under restrains akin to arrest when questioned, see California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (Docket No. 18, Gov't Reply Memo. at 12). The Government reiterates that, since defendant was not under arrest and was free to terminate the

7

interviews, she was not in a situation akin to arrest and hence not in a custodial interrogation.  The Court must examine all the circumstances surrounding the interrogation to answer this inquiry, Stansbury v. California, 511 U.S. 318, 324 (1994) (per curiam); see Newton, supra, 369 F.2d at 670.  A coercive environment alone, however, does not make a non-custodial situation custodial to require Miranda warnings, Oregon v. Mathiason, 429 U.S. 492, 495 (1977); see Newton, supra, 369 F.3d at 671.

A.      Was Defendant "Free to Leave"?

Miranda held that custodial interrogation meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 444 (emphasis added).  This first element determines whether a suspect is seized, see Newton, supra, 369 F.3d at 672.  In this case, after an unexpected arrival of two internal affairs agents, defendant was placed behind the closed, unlocked door of a conference room at her work place during both interviews.  She was advised that she was free to go but remained during the questioning.  She had her firearm with her during at least the first interview, with the agents later questioning whether she should have it given her distraught state.  The aggressive manner of the interviews, however, belied the assurances in the written Beckwith warning and in the agents' statements that she was free to remain silent or to terminate the interview.  Defendant thus was not free to leave.

B.      Was Defendant's Freedom Curtailed to the Point of an Arrest?

As the Second Circuit noted in Newton, "not every seizure constitutes custody for purposes of Miranda," 369 F.3d at 672.  As the Government argues, defendant was never arrested or threatened with arrest during her questioning.  She was told three times that she was free to

8

leave (Docket No. 18, Gov't Reply Memo. at 5, citing Gov't Ex. 2, June 4, 2004, Tr. of interview at 1, 25-26, 101).  But the agents threatened her employment as well as threatening her with potential criminal prosecution.

The Government relies upon the Second Circuit's decision in Newton and its standard of whether a reasonable person would believe that they understood their freedom of action was curtailed to a degree associated with formal arrest, Newton, supra, 369 F.3d at 672 (id. at 12). There, defendant appealed the denial of a suppression motion following a parole violation search at defendant's home.  Six police and parole officers entered defendant's apartment, and he was handcuffed while they entered and searched the apartment, but defendant was told that he was not under arrest when the officers began questioning him, 369 F.3d at 675-76.  The Second Circuit found that those circumstances (especially the fact that defendant was handcuffed during the search and questioning) a reasonable person would conclude that they were under an arrest-like restraint, id. at 676; see id. at 662.  The Circuit Court cited traffic stop cases, with their different Fourth Amendment standard, in establishing the Fifth Amendment/Miranda standard, that is, whether a reasonable person would understand his detention was not likely to be temporary or brief and whether the person during that stop felt that he was completely at the mercy of the police, id. at 675 (quoting Berkemer v. McCarty, 468 U.S. 420, 437, 438 (1984)).  McCarty, in turn, distinguished the traffic stop from the more typical station house interrogation because the latter is frequently prolonged and "in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek," McCarty, supra, 468 U.S. at 438 (citing Miranda, supra, 384 U.S. at 451).

Aside from a formal arrest, courts have found that a defendant was in an arrest-like situation when surrounded by many officers and was handcuffed, New York v. Quarles, 467 U.S. 649, 655 (1984); see Newton, supra, 369 F.3d at 675-76 (telling a handcuffed suspect that he was not under arrest does not have the same weight as when the suspect is not restrained and is told the same thing).

Unlike Beheler, cf., 463 U.S. at 1121-22, 1125, defendant here did not voluntarily report to these agents for questioning or initiate the interviews; rather the agents came to her place of employment for both interviews and placed her in a closed conference room for the questioning. The single, station house interview in Beheler lasted thirty minutes, id. at 1122, and the stop in Newton also was briefer, Newton, supra, 369 F.3d at 664 (one minute from entry to arrest), 675 (few minutes for officers to find firearm while defendant was handcuffed), while here the May interview lasted almost two and a half hours (Docket No. 18, Gov't Reply Memo. at 6 (citing Gov't Ex. 2, Tr. at 1, 106)).

Here, defendant was taken from her work station and placed in a closed (but not locked) conference room at her place of employment.  The first interview lasted for almost two and a half hours.  Assured that she could stop the questioning at any time, that she was not under arrest, not handcuffed or otherwise physically restrained, and (at least during the first interview) she possessed her sidearm, defendant was free to leave.  A reasonable person in those circumstances would conclude that they were not in an arrest-like restraint; therefore, defendant was not in custodial interrogation during the May and June interviews to require advising her of her Miranda rights.  Thus, defendant's motion to suppress her statements should be **denied**.

III.     Was <u>Beckwith</u> Warning Issued Here Substantially Similar to <u>Miranda</u> Warnings?

The Government alternatively argues that the <u>Beckwith</u> warning given to defendant here was substantially similar to a <u>Miranda</u> warning (Docket No. 5, Gov't Response at 9-10; Docket No. 18, Gov't Reply Memo. at 9), hence her statements following defendant being advised of her <u>Beckwith</u> rights should not be suppressed.

The essence of the <u>Miranda</u> warning is that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement  he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," 384 U.S. at 444.

<u>Beckwith</u> held that a full <u>Miranda</u> warning need only be given if a defendant is in custody or some other coercive situation, <u>id.</u> at 345-46.  <u>Beckwith</u> upheld a different warning issued by the Internal Revenue Service in a non-custodial interrogation.  The <u>Beckwith</u> warning alerted the subject that the statement or her silence could be used administratively as well as criminally.  As reported by Justice Marshall in his concurrence in the judgment, the IRS used the following warning:

> "'As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
>
> "'Under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way.  I also advise you that anything which you say and any information which you submit may be used against you in any criminal proceeding which may be undertaken.  I advise you further that you may, if you wish, seek the assistance of an attorney before responding.'"

<u>Beckwith</u>, <u>supra</u>, 425 U.S. at 348-49.

In this case, the Professional Responsibility special agents used a modified text of the Beckwith warning for the written notice that defendant signed. The key element missing from this written warning that appears in both the Miranda and Beckwith warning used by the IRS in that case was a warning to the defendant that she may seek the assistance of counsel before responding. As reported by the Government (Docket No. 5, Gov't Response, Ex. 3; Docket No. 18, Gov't Reply Memo. at 4) that warning read:

> "You have the right to remain silent if your answers may tend to incriminate you.

> "Anything you say may be used against you as evidence later in an administrative proceeding or any future criminal proceeding involving you.

> "If you refuse to answer the questions posed to you on the grounds the answers may tend to incriminate you, you cannot be discharged solely for remaining silent. However, your silence can be considered in an administrative proceeding for its evidentiary value that is warranted by the facts surrounding your case."

This written warning, however, did not inform defendant of her right to be advised by counsel before answering the agents' questions. The government argues that the agents orally told her that she had the right to have a lawyer present and defendant agreed to proceed with the questioning without one (Docket No. 18, Gov't Reply Memo. at 6 (citing Gov't Ex. 2, June Tr. at 101)), but the transcripts of these interrogations were not left with the Court. Defendant never sought counsel or outside assistance (such as union representation) during the interrogation and is not now objecting to the warning because of its deficiency in not mentioning the right to counsel. The Court, however, need not address the adequacy of the Beckwith warning text issued to defendant and signed by her since the circumstances during her interviews with the agents was not custodial requiring a warning of Miranda rights or warnings closer to those contained in Miranda warnings.

## CONCLUSION

For the reasons stated above, on defendant's motion to suppress (Docket No. 4), it recommended that the motion be **denied**.


Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report and Recommendations to all parties.

**ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIC TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provision of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

_/s/ Hugh B. Scott_

Honorable Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
February 6, 2007

14